Good afternoon. May it please the Court, I am Ryan Higgin of the NAACP Legal Defense and Educational Fund and counsel for the Plaintiff's Appellants in this action. I'd like to reserve five minutes for rebuttal. This is a very rare felon disenfranchisement case in which three factors act together to establish liability for vote denial in violation of Section 2 of the Voting Rights Act. First, plaintiffs here have established substantial evidence that the pronounced racial disparity in nearly every phase of Washington's criminal justice system cannot be explained away by race-neutral, non-discriminatory factors. Second, the defendants here have failed to offer any alternative explanations for the racial disparities as they exist in the criminal justice system or to contest any aspect of the plaintiff's record which the District Court recognized as compelling evidence of racial discrimination in the criminal justice system. Finally, and significantly for purposes of Section 2 of the Voting Rights Act, the District Court recognized that Washington's felon disenfranchisement law interacts with racial inequality in the criminal justice system to shift inequality into the political process. Taken together, this is the essence of a Section 2 vote denial claim, where in the totality of the circumstances, a factor that is external to voting interacts with a voting qualification to result in denial of the right to vote to plaintiffs on account of their race. This is not a case that challenges the general validity of felon disenfranchisement law. Nor is it the case that plaintiffs argue that mere statistical disparities alone in felon disenfranchisement establish a cause of action under Section 2. Rather, what plaintiffs argue is that Washington's felon disenfranchisement law is used as a tool for racial discrimination. Your Honor, this rests on the theory of finding that the entire criminal justice system in the state of Washington is intentionally discriminatory against minorities. That's not right, Your Honor. What the evidence shows in this case, as the District Court found, is that the racial disparities Washington's criminal justice system arise from and result in discrimination on account of race. So there's no finding or no contention that there was any intentional discrimination even at the level of the criminal justice system? That's right, Your Honor. What our experts did here is… This is all an effect. That's right, Your Honor. In fact, when Congress amended Section 2 in 1982, they relieved plaintiffs of the burden of having to prove intentional discrimination. What the evidence shows here, as our experts point to, is that there are racial disparities in Washington's criminal justice system that aren't justified by actual participation of racial minorities in crime. Doesn't Salt River say that that's not enough? That's right, Your Honor. The Salt River held, as this Court knows, that disparities alone are not sufficient. But what's significant here… We'd have to overrule Salt River. You would not, Your Honor, because what's significant here is that the District Court actually distinguished the evidence proffered in this case from that provided in the Salt River. This Court will remember that in Salt River, the Court was constrained by the party's stipulation to the nonexistence of every factor that would lead the Court to find racial discrimination. Here, the District Court distinguished our evidence from that proffered in Salt River by finding that the disparities in this case arise from and result in discrimination on account of race. So for example… Let me just ask you on the issues before the Court. I recognize that you come here in a posture of having presented substantial and very impressive evidence before the District Court. But you are also doing that on a landscape that clearly permitted this kind of a claim to fall within Section 2. My question now, that we're back as an embanked Court and the Section 2 issue is on the table, is why should we part company from the other circuits with respect to the viability of such a claim under Section 2? Because, Your Honor, that's what the plain language of Section 2 requires. Section 2 applies to any voting qualification without exception. And it's equally plain that Washington's felon disenfranchisement law is a voting qualification. Those two propositions should constitute the entirety of the analysis. That is to say… But what do you do then with Section 4 and the congressional discussion with the precise potential disqualification here, which is the felon disenfranchisement? It seems that we can't read Section 2 without taking the actual control, but you may have a way to reconcile that. And I'd appreciate hearing your view, because I think when you look at Congress having taken into account, which I thought Section 4 did, really, that's where you look at the issue of felon disenfranchisement, that there you have almost a specific overriding agenda. So I think there are a couple responses to Your Honor's question. The first is that the Supreme Court is cautioned against using the legislative history of one section of a statute to interpret another. So Section 4's legislative history can't be used to construe what Congress meant when it passed Section 4. Section 2, that Congress carved out an acceptance of felon disenfranchisement in Section 4 doesn't mean that they sought to exempt from scrutiny discriminatory felon disenfranchisement laws under Section 2's coverage. And our argument here, Your Honor, is that the plain language of Section 2 requires that we follow the cardinal canon of statutory interpretation, which holds that where a statute is plain on its face, the sole function of the courts is to enforce it in its plain terms. More recently, the Supreme Court has explained that the authoritative statement of Congress's intent is found in the text of the statute, not in the legislative history of the statute. Let me ask you about the plain language of the statute. It says no voting qualification or prerequisite to voting. If you just look at the words, you don't look at the history, which is what we all know that Congress was concerned with the poll taxes and literacy tests that the southern states used to disenfranchise black people from voting. Just look at the words. The felon disenfranchisement is not a qualification or prerequisite. It's a disqualification for people who have previously been qualified. If we go beyond this statute and we look at not legislative history, which I agree with you, it's pretty dubious for the usual reasons, plus the reason that none of us said, none of the legislative history says that they meant to get rid of felon disenfranchisement in 65 or 82. But if we look at other statutes, the National Voter Registration Act of 1993 and the Help America Vote Act of 2002 both have provisions requiring the federal government to assist the states in felon disenfranchisement enforcement. When I look at the package together, what I get is a history where these felon disenfranchisement laws were adopted, not for the purpose of excluding black voters, but excluding white voters, because the southern states used to exclude black voters because they were black. They didn't need any indirect tricks. All the states excluded felons. And for the states that excluded blacks from voting, every single person excluded from voting on account of felon disenfranchisement was white. I just think it's extraordinary to try to read the words which don't seem to apply in light of other legislation which makes it clear that the words don't apply. And history which makes it clear that the words were never meant to apply to mean the opposite. Your Honor, I think that the text of Section 2A of the Voting Rights Act, no voting qualification or prerequisite to voting, captured pretty clearly Washington's felon disenfranchisement. Why does that just speak to qualifications like paying your poll tax and passing the literacy test as opposed to disqualification? For example, if you move out of the state, you might be disqualified from voting because you don't live there anymore. Your Honor, I think it's a distinction without a difference. The reality is that Washington imposes this felon disenfranchisement disqualification. Suppose you could prove that most of the people who left a particular state, say most of the people that left Louisiana and Mississippi and went to Chicago some time ago were black, or a much higher proportion of blacks than whites left the southern states where they were discriminated against and went to Chicago. Would that mean that leaving the state, becoming a nonresident, and therefore being disenfranchised was prohibited? Your Honor, if, as in this case, the plaintiffs were able to trace the discriminatory impact of the particular voting qualifications or racial discrimination, they'd have a viable claim under Section 2 of the Voting Rights Act. The people that have lived in Chicago for 10 years would still be entitled to vote in Louisiana and Mississippi because the residency, nonresidency disqualification for people who leave would be covered by Section 1973. Your Honor, the residency requirement is a voting qualification, but in the facts of Your Honor's hypothetical, the result would have to be a discriminatory one on account of race, as the plaintiffs have established in this case. As to Your Honor's point about looking at later congressional enactments to construe what Congress intended in 1982 when they passed the law, the Supreme Court has also cautioned against looking at later congressional enactments for the purpose of understanding what Congress meant in 1982. The best evidence of what we do in a different context at a later time. They said Congress can't say in 2010 what it meant in 1973. Or in 2006 or in 1993. The best evidence. But here Congress isn't saying what it meant. It's just passing laws that plainly require the feds to assist the states with felon disenfranchisement. Your Honor, in 1982, Congress set out to expand a law that they had previously enacted to eradicate racial discrimination from voting, root and branch. And Congress is clear. Counsel, I have two questions about current developments or recent developments that may or may not affect what we do. But I'd like to ask you about both of them. One is the question whether the Court should wait for the Supreme Court to act on the cert petition in Simmons v. Galvin from the First Circuit, which is pending and on which the Solicitor General has been asked for a brief. And the second is the amendment of the Washington statute so that in fact it's really a prisoner disenfranchisement law because presumptively once someone is no longer incarcerated, they're generally restricted their right to vote. And I wonder if you would be willing to comment on those two developments as to how they should influence our analysis. Sure, Your Honor. I guess my best estimation as to the first question is that the Supreme Court may be waiting to see what this Court does with this matter. I don't know what you can do about that. Maybe she doesn't ask. And that might mean you don't want to win here. That's the Honor's second question. The ACLU's amicus brief points out that Washington's amended felon disenfranchisement law continues to disenfranchise 27,000 people who are non-incarcerated who are currently living under community custody, which is Washington's version of parole. What that means, in effect, is that there are more people living, more non-incarcerated people living under disenfranchisement than there are presently incarcerated people, which there are 16,000. So Washington's amended law actually disenfranchises more people who are non-incarcerated than who are incarcerated. Well, which one is before us? Your claim has to do with the original version. Yes, ma'am. Which is now mooted, right? I'm sorry, Your Honor? Which is now mooted. No, not at all, Your Honor. In fact, what Washington's amended law does not do is it does not alleviate the racial discrimination that's in the criminal justice system, nor does it prevent racial minorities from being. . . I hear your argument on that. My question is, is the original statute still a live issue before us? Absolutely, Your Honor. And that's because the amended statute does not remove the discrimination from Washington's criminal justice system,  and the original statute does not remove the discrimination from Washington's criminal justice system. So the original statute does not remove the discrimination from Washington's criminal justice system. That's the answer with respect to the amended statute. With respect to the amended statute, it does not cure the ill that we see. Well, no. Which statute is the live statute that we have to decide? Your Honor, the live statute is 29.08, the statute that we challenge in this case. That's the amended statute, though. The amended statute has a very similar number to the original statute. In fact, I guess now. . . Well, how can we possibly make a decision about a statute that's been repealed? That's why I asked you about the provisions of the new statute. If there is a live controversy. . . Sure. Wouldn't it have to be about the statute as it now is? The statute as it now is, is the statute that we now challenge, Your Honor. And the. . . You're saying that the evidence you presented to the district court applies with equal force to our statute. That's right, Your Honor. And in fact, what the plaintiffs have been able to show in the context of prosecution, for example, is that even considering statutory standards designed to limit prosecutorial misconduct, and even in the presence of legally relevant variables, prosecutors in Washington State recommend that blacks are more likely to be charged with an offense and to receive a longer prison sentence, with prosecutors recommending that blacks spend 50 percent more time incarcerated than similarly situated whites. Counsel, I'm still. . . Counsel, I'm still stuck at the threshold question of whether felon disenfranchisement statutes are even covered under Section 2. And I'm looking at the Supreme Court case in Richardson v. Ramirez, where the holding is that the exclusion of felons from the vote has an affirmative sanction in Section 2 of the Fourteenth Amendment. How can we ignore that expression from the Supreme Court? Your Honor, the plaintiffs in this case don't challenge the general validity of felon disenfranchisement. What the plaintiffs challenge in this case is the impermissible role that race plays in the application of Washington's felon disenfranchisement law. The Richardson case in Section 2 of the Fourteenth Amendment don't prohibit this Court from applying Section 2 to Washington's felon disenfranchisement law for three reasons. Well, first of all, Section 2 of the Fourteenth Amendment expressly makes an exception for crime, for conviction of crime. But, Your Honor, the Fourteenth Amendment doesn't affirmatively sanction discriminatory felon disenfranchisement laws. Washington has the authority to disenfranchise some, all, and none of its felons, but it can't do so on a discriminatory basis as it's doing here. And the second reason, Your Honor, is that the Fifteenth Amendment itself doesn't carve out an exception for felon disenfranchisement. It's noteworthy to point out that the Reconstruction-era Congress explicitly considered an exception for felon disenfranchisement in the Fifteenth Amendment and ultimately rejected that exception, underscoring Congress's intent to reach all voting qualifications that have discriminatory results. And the third reason, as this Court recently pointed out in Harvey v. Brewer, is that the absence of a constitutional prohibition doesn't bar a statutory one. Indeed, it's noteworthy to point out that Congress has historically prohibited certain types of felon disenfranchisement. Again, the Reconstruction-era Congress prohibited readmitted States from disenfranchising for statutory felonies, even though the Fourteenth Amendment provides States with the authority to disenfranchise both for statutory and common-law felonies. But let me go back not to the congressional intent but the congressional language and to my question to you about reading the statute as a whole. If you have Section 4, which at the time the Voting Rights Act was adopted, of course, a distinction was made between covered and non-covered jurisdictions. And it seems to me that you would have this bizarre paradox with respect to felon disenfranchisement laws under Section 4 if somehow they were meant to be included under Section 2 if you permitted them, for example, in the covered jurisdictions and you didn't in the other jurisdictions, in the non-covered jurisdictions. So could you go back and try to reconcile how those pieces of the statute fit together, particularly given this distinction that was made and continued to be made for a long time over covered versus non-covered jurisdictions? Well, the truth is that Sections 4 and Sections 2 are different sections. They serve different purposes and they have different language. I think the best example of what Congress intended is looking at Section 2 itself. And the best lesson to be learned from Section 4. That doesn't answer my question. I know they're different sections because you can see they have different numbers, but they are in the same statute and you have to read the statute as a whole. So to just simply say they're different sections and they have different words in them doesn't really answer the question of how does this fit together as a scheme to attack what you eloquently started out with, which is discrimination in the voting system. Well, I think the best example, the best guidance we get is from the Supreme Court, Your Honor, which cautioned against reading different sections of the statute to interpret another provision of the statute. The best example to be learned from Section 4 is that where Congress sought to carve out and accept the felon disenfranchisement, they did so unambiguously. And I think that we cannot read Section 4's exception for felon disenfranchisement to mean that Congress exempt discriminatory voting qualifications, like Washington's felon disenfranchisement law, from scrutiny under Section 2, which Congress enacted to root out discrimination in voting root and branch. All right. I have another question. If we, as sitting as the en banc court, were to reaffirm the holding of Vericon 1 and 2 that felon disenfranchisement falls within the prohibition of the RA Section 2, we would be creating a circuit split that would surely get the Supreme Court's attention. I mean, if the statute is in the RA Section 2, then it would be a little bit harder  If the statute is in the RA Section 2, then it would be a little bit harder to get the Supreme Court's attention. But the question is, with respect to the following section, how would you distinguish the other three circuits' reasoning from what we have before us? Sure, Your Honor. The other three circuits, the 1st, 2nd, 11th circuits, were issued opinions that were vigorous dissents by members of those courts. I know they were vigorous dissents. And one of them was by Justice Sotomayor. Right. And I'm glad you mentioned that because I was going to share that with Justice Sotomayor. Well, you were quoting her a minute ago. I did. I was actually going to do it again if Your Honor doesn't mind. And those three circuits reached those conclusions after disregarding the cardinal canon of statutory interpretation. As Justice Sotomayor, then Judge Sotomayor, in her dissent, Hayden v. Pataki, explained, it's clear to anyone reading Section 2 that it applies to all voting qualifications without exception. And it's equally clear that felon disenfranchisement laws are voting qualifications. Justice Sotomayor said that those two propositions should constitute the entirety of the analysis, that a clear and unambiguous statute, which was intended to capture all voting qualifications, would apply to felon disenfranchisement laws, which are voting qualifications. But what is the remedy that you wish here? Is what you're seeking an order that where a felon disenfranchisement disproportionately impacts blacks, that all felons must vote?  That's right, Your Honor. Now, on this record, Washington's felon disenfranchisement law violates Section 2 of the Voting Rights Act. And though it arose in a different context, Hunter v. Underwood, it's helpful here in that when the U.S. Supreme Court found that Alabama's law violated the Constitution, they enjoined operation of that law. They struck down that law as to everyone who was disenfranchised under that law. The record in this case, Your Honor, requires that this Court enjoin Washington's felon disenfranchisement law. I do have a question about that, about how to understand subsection B of Section 2, because a violation is established by showing that the political processes leading to nomination or election are not equally open. And what you seem to be saying is that once you show that a voting standard results in a disproportionate effect on one racial group or another, that translates automatically into a showing that the political process is affected. And I wonder if that is correct or if there is some other step that has to be gone through in an evidentiary sense, even accepting everything else you say, as to showing how the political process leading to nomination or election is infected by discrimination, because that seems to me a different question. Well, Your Honor, as to our clients who allege vote denial, the political process is not open at all. The equally open text here has more relevance in the context of vote dilution, where we're looking at aggregating votes according to what a racial minority is entitled to in influencing elections. Here, we're talking about the value of participation, and our clients don't have that right at all, don't have access to the ballot box at all. Returning to the example of the prosecutor, the evidence that we've shown in the context of prosecution, we've shown in this case that prosecutors recommend that blacks who are similarly situated to whites spend 50 percent more time incarcerated than poor. This raises a question in my mind. It's a little hard for me to get it out cleanly, quickly. But the criminal justice system, unlike almost anything else I can think of in this context, is a unique animal in that it has its own built-in protections. So if the prosecutor has prosecuted selectively, there is a remedy for that. If the investigation has been based upon evidence obtained through discriminatory means, there is a remedy for that. You can't be tried by a discriminatory jury. So once convicted, then it's not exactly that it's implicating Heck v. Humphrey, but it's bumping up against the notion that you're trying to say at the end of the day, without having achieved a remedy during the process, that in fact conviction should not have been, should not stand. Well, I don't see the plaintiff's claims here raising any Heck v. Humphrey. Well, I didn't say it did. I said it just is, it's bordering on a very peculiar notion. But this is not a collateral attack on the plaintiff's conviction. I'm not here. What the plaintiffs are arguing here is a violation of those Section 2 rights. And I think that Senate Act of 19- Why wouldn't this lead to that precisely? If this were upheld and there's a determination, final determination, that the entire criminal justice system in the State of Washington is racially discriminatory, why wouldn't there be a launch pad for collateral attacks on judgments? If you are convicted by a system that is racially discriminatory, it seems to me we have a bigger problem than not voting. Isn't that what Judge Ragai pointed out in Hayden? She did, Your Honor. And that particular concern was misguided because the standard in challenging one's criminal conviction is intentional discrimination. The evidence amassed here shows that the effect of racial discrimination in the criminal justice system disproportionately denies the right to vote to racial minorities. I think it follows from your argument, then, that felon disenfranchisement laws are fine so long as the State prosecutes, convicts more whites and more people of other races other than I think it was blacks and Hispanics that were in the record in this case as having disproportionate convictions. So it's not felon disenfranchisement that's the problem. It's that – and it's not that the defendants are innocent of the felonies and were only convicted because of racial discrimination. It's that not enough white felons are getting caught. So your argument is, I think, by implication, that felon disenfranchisement laws are just fine so long as they convict enough whites. Is that true? My argument, Your Honor, is that the States have the authority under the 14th Amendment and following the Supreme Court's ruling in Richardson v. Ramirez to disenfranchise their citizens so long as they don't do so on a discriminatory basis. But they don't here. All felons, all felons, regardless of race, are disenfranchised. I mean, subject to this law. On the basis of the statute. That's right, Your Honor. But what's happening in Washington State is that racial discrimination in the criminal justice system is being injected into the political process through the felon disenfranchisement law. And I think Senate Factor V provides a great example of the way in which Congress wanted, of course, to look at the way that racial discrimination is shifted from external things, external factors from the voting process into the political process. But shouldn't we use, you know, the district court here in looking at the evidence, look at more than Senate Factor V? Is it your position that Senate Factor V is the bellwether in a case like this and that if you're correct on the remedy being available, that the Court shouldn't look to the other Senate factors? Your Honor, Congress intended for the list of Senate factors to be considered in their totality, applying those factors that are relevant to a particular case at hand. And Congress is clear that no single Senate factor is dispositive. What's interesting about what the district court did was it held on its own that Senate factors 2, 3, 4, and 6 are irrelevant in the context of vote denial, but proceeded to consider them against the plaintiffs in any event. And the Supreme Court explained that the majority of the Senate factors are particularly pertinent in the context of vote dilution, as almost all of them look to the effectiveness of votes cast by racial minorities, not to the question of whether minorities have access to the ballot at all. We have about three minutes left. Did you want to save? Yes, Your Honor. I wanted to reserve five minutes for rebuttal. Well, I have three minutes now. I'm sorry, Your Honor. I'm going to give you a spoke, it's free. Thanks, Your Honor. Okay. We'll hear from the State now. Chief Judge Kaczynski, and may it please the Court. I'd like to begin with the question of whether the Voting Rights Act applies to felon disenfranchisement. We believe strongly that it does not, which is exactly the conclusion reached by the first, second, and eleventh circuit courts of appeal. First —  Would you state your name for the record? I'm sorry. Attorney General Rob McKenna, State of Washington. Welcome. In the first instance, the plain language of the Voting Rights Act makes it clear that it does not apply to felon disenfranchisement. Appellants focus on the language in Section 2A, but the Supreme Court made it clear in Chisholm v. Romer, a VRA case involving the election of judges, that one must read Section 2A and 2B together. And when one reads Section 2B, you see how to apply Section 2A. 2B is the language which refers to the political processes and whether they are equally open to participation by members of a class of citizens protected by Subsection A, and refers to their opportunity to participate in a political process. As the case of the — But Subsection — Subsection A states the type of rule, qualification, prerequisite standard, practice or procedure that could be covered if the proof exists. B is about what you have to prove. Correct. But it's not about where — in theory, what kinds of things that proof can pertain to. So why isn't a law of this kind one of the following, a voting qualification, a prerequisite to voting, a standard, a practice or a procedure? For the purposes of the Voting Rights Act, none of that language applies to felonious enfranchisement. We think the plain language — Well, that's sort of the ultimate answer that you want us to come to, but I don't — but it's not an explanation. Why isn't a law that says that people who have certain status or have engaged in certain behavior are no longer entitled to vote, why doesn't that count as a standard practice or procedure related to voting? Because the Congress did not intend for it to apply to convicted felons. The right to vote does not extend to felons in the first instance. They have lost their right to vote previously and, therefore, are not within that class of citizens who have a meaningful opportunity to participate in the political process. This is exactly the conclusion reached by the Hayden Court and the Simmons Court. But wait a second. Why do they not have the right? They don't have the right because of the felon disenfranchisement. Right. So that's not an answer. That's a circular response. No, I just — That's what I'm saying. You can't read, therefore you can't vote, therefore you're not covered. Except that, unlike literacy tests, Judge McKeown, felonious enfranchisement is sanctioned in Amendment 14, Section 2. That's a different question. I think you're saying that good moral character is, in fact, a qualification for voting. Is that right? I'm not. Good moral character is expressly addressed as being impermissible under Section 4 of the Voting Rights Act. That's the section where you would expect Congress would have addressed felon disenfranchisement if they intended to do so. So you don't have to have that good a moral character, but you have to have non-felonious moral character. The Congress made it clear that — You say that is a qualification, but because they didn't mean that, it shouldn't count. Judge Clement, the language of the Washington State Constitution refers to losing the right to vote for committing felonies. That's the issue here. It's not a question of moral character. Moral character isn't the language that's used in our State Constitution or our State statutes. It is language that was addressed by the Congress in Section 4 of the Voting Rights Act. I don't think you understood the thrust of — or why I was asking the question. I understood your argument to concede that not having committed a felony was, in fact, a voting qualification, and for your argument not really to be a plain language argument, even though you characterized it that way, but a legislative intent argument based on other things. And I'm trying to find out exactly what it is. The reason we think that the plain language of Section 2 does not bring felon disenfranchisement within its scope is the language in Section 2 be taken with Section 2a, because the language refers to the goal of Congress to see that citizens have an opportunity to participate, and they want to know whether the challenged qualification or practice. It says it's violations established if based on a totality of the circumstances. Correct. The processes are not equally open to participation by members of class protected by Subsection A. Yes, Your Honor. And in the Hayden-Simmons Court, they pointed out the obvious fact that felons have less opportunity to participate. Well, you really can't go in there holding up signs for your favorite candidate and calling people on a phone, telling them to vote for them if you're in prison. Correct. Since they're in jail, they don't have a meaningful opportunity to participate in the political process. I want to – I'm sorry. So is it a plain language argument?  And so we address the legislative history in our brief as well, because it apparently is relevant by some of the other courts that have looked at the question. I would like to present you with a hypothetical. Let's suppose there is a state that has never had a law like this before, and the legislators say, well, we know we can't have a poll tax anymore, we know we can't have literacy tests anymore, but there's a really, really good way to keep racial minorities from having their fair share of the political process. We'll pass a felon disenfranchisement law for the express purpose of making sure that we have fewer minority voters. Is that something that is covered by Section 2 of the Voting Rights Act or not? And if not, why not? It would be covered by the Fourteenth and Fifteenth Amendments in the first instance. This is pretty much the situation of Hunter v. Underwood, where the Supreme Court didn't have to reach the Voting Rights Act in 1985. They simply looked to equal protection under the Fourteenth Amendment, and the Fifteenth Amendment's explicit prohibition on voter discrimination. So one would not even reach the Voting Rights Act, because where there's intentional discrimination, you would refer, first of all, to the Fourteenth and Fifteenth Amendments. And therefore, that would, you know, therefore, you wouldn't need to go to the Voting Rights Act, because of the Fourth Amendment. But if you did, what would you find out? Would it be that it is also prohibited by statute or that it is not? If there were a finding of intentional discrimination, even though the Voting Rights Act no longer requires a finding of intentional discrimination, then it's conceivable that a court could say, yes, this violates the Voting Rights Act as well as the Fourteenth and Fifteenth Amendments. But I don't think they would reach that question. So the real question, though, I mean, I guess what I'm trying to figure out here is whether you're saying in theory it's possible, there just isn't any proof here that the political process has been tainted in the way that it's forbidden bisection to be, or whether you're saying don't even think about that question. Judge Graber, it's not hypothetical in this case. There was a Fourteenth Amendment equal protection claim and a Fifteenth Amendment claim made in this case. It was dismissed by the district court back in 1997. It was not appealed. It was no longer before the court. The district court found expressly no intentional discrimination in Washington, and the more the district court in 2006 found, looking at the totality of circumstances, a, quote, remarkable absence of any history of official discrimination in Washington. That sounds like a Section 2B factual argument to me and not a theoretical argument. I am referring to the district court's conclusions based on the evidence before it. Yes, Your Honor. So what do you make of the findings? So your position is there's no intentional discrimination in this case in passing the vote, felon disenfranchisement, the voting provision. But now we go one step back, and I'm now looking at the district court's order. Do you have it handy or do you remember it? Well, this is page 10 of the district court's order, where the district court says And I had some of this discussion with opposing counsel. It says the court finds both of these reports to be compelling evidence of racial discrimination and bias in Washington's criminal justice system. And there's a footnote, which I'm sure you're familiar with. Yes. Footnote 7, Your Honor. It says contrary to the defendant's assertion that these reports are based solely on statistics and are thus insufficient evidence for a VRA claim, the court finds these experts' conclusions from the available statistical data admissible, relevant, persuasive. Now, my question, my specific question is, is this a finding of intentional discrimination by the State of Washington in the administration of its criminal justice system? No, Chief Judge Kuczynski, it is not. It is a finding of sufficient statistical evidence to conclude that Factor V applies in this case. Then the court went on to postdate it. So you agree with opposing counsel that this is a mere disparity finding? This is not an intentional discrimination finding? Correct. I have some – I have read it differently, because when you talk of racial discrimination, discrimination connotes, to my mind, an active state of mind, as opposed to disparity, something that merely happens, a difference between two things. Discrimination suggests an intent to separate one thing from another. And so I have read that sentence as a finding of intentional discrimination in the administration of the criminal justice system in the State of Washington. You don't read it that way, and I gather that opposing counsel doesn't either. And I'm a little – I'm not sure I'm entirely persuaded by that, but, Your Honor, if there is no intentional discrimination here, and both counsel agree as to that, then without intentionality either at the – regarding the voting requirement, and that has to do with felons, or intentionality with respect to the administration of the criminal justice system, how do you get a coverage by – under Section 2? We don't believe that the statistical disparities and the disproportionality cited by the district court brings our statute within the coverage of Section 2.  Well, let's say there were – let's say unquestionably there were disparities. Let's decide – and I understand you dispute that vigorously. You believe there's not sufficient evidence for that, and we can discuss it. But I'm right now – let's say we put that question aside and there were undisputed or quite clear evidence that the criminal justice system operates in a disparate, although not discriminatory, although not intentionally discriminatory, manner. And what I'm asking is, is that enough to trigger a Section 2 violation? No, we don't believe it is, Your Honor. In fact, this Court in Salt River and several other district courts in cases like Ortiz, Urubi, Salas, Burton all concluded that statistical disparities are enough or simply not enough to establish a VRA claim. And what the judge below did in his – says in his footnote is he analogizes to employment discrimination suits in which disproportionate impact is the correct standard under Title VII of the Civil Rights Act. It is not, however, the appropriate standard under Section 2 of the Voting Rights Act, where you have to show – you have to apply a results test and you have to show a causal connection between the challenge voting practice, assuming it is a challenge voting practice, or qualification and the evidence that you have. And this simply has not been the case here. In fact, even where disparities are cited by the expert witnesses, they explain away most of the disparities. They say most of the disparities are explainable by legally relevant factors. Secondly, Crutchfield, who conducted the survey of all the studies, said, quote, these studies are not designed to uncover causes of discrimination. So what we're left with is a set of experts who say, well, we don't think we can explain it by legally relevant factors, so we're going to assume that this is the – that the remaining disparity is the result of discrimination, without actually proving the discrimination, because, as Crutchfield points out, this case is one of them. That's how we often make decisions in real life. As Sherlock Holmes said, when you exclude all the impossible possibilities, then the improbable is the only – must be true, because it's the only – when we operate that way in real life, we say you have evidence of certain things, you sometimes can get positive proof of something, and you say, well, what are the likely causes? And it's not this likely cause, it's not this likely cause, it's this likely cause. We therefore write this finite and the possibility is infinite, and we move on by saying it must be this other thing. Why is that a perfectly appropriate way for the experts to operate in this case? Because Congress said it's not, Your Honor, for purposes of the Voting Rights Act. Congress applied a totality of circumstances test, which other courts have read to mean disparities alone simply are not enough. One must look to the totality of circumstances, which the Farrakhan II panel simply refused to do. They refused to look beyond Factor V, dismissing the analysis of the other factors which were relevant, which the district court did analyze in concluding that under the totality of circumstances, even though he did find compelling evidence of – based on these statistical disparities, he concluded that under the totality of circumstances, our felon's enfranchisement law does not violate the Voting Rights Act. So when I think that's interesting about the district court opinion is that significantly defendants in the State of Washington do not present any evidence to refute plaintiff's experts' conclusions. So is that an accurate statement of the fact that the State was just willing to go with its legal argument in effect? Jeff McEwen, we did focus on a legal argument, but we have also pointed out the fact that all these studies show are statistical disparities, most of which are explained away. We repeatedly observed in our briefing that the experts themselves explain away most of the disparities. But secondly, and more importantly, it's not enough to prove the VRA applies to felon's enfranchisement, even if one assumed that it were enough to prove Factor V, which we disagree with. And that's, of course, the conclusion the district court reached, that even though he found, that district court judge found that it was enough under Factor V, it certainly wasn't enough to apply the VRA to Washington felon's enfranchisement under the totality of the circumstances test, because he did look at the other relevant factors. Kagan. So let me just ask you this, this question, that if one assumed without deciding that there is a claim under Section 2, what would be your position? We would argue that the evidence is not sufficient under Section 2 to conclude that our felon's enfranchisement statute in application violates the or under the totality of circumstances violates the Voting Rights Act. I mean, for example, the one of the figures that the appellants rely on heavily is this ratio of 9.3 to 1, the ratio of African Americans who are incarcerated to those who are in the general population, yet that's a 1980 figure. If you look at the numbers in the last few years, that ratio has dropped by more than 50%, indicating a responsiveness of the judicial and political systems of Washington State. Secondly, most of the studies that they rely on are studies that were commissioned by Washington State itself, by the Washington Minority and Justice Commission, which was created expressly to address concerns about disproportionality in our criminal justice system, or a study by the Washington State Patrol,  in response to the Christensen 1980 study, which has resulted in several amendments to State law that have had the effect, amendments to sentencing, amendments requiring that the judges write down the reasons for applying an exceptional sentence. The totality of the overall effect of all of these amendments has been to contribute to a more than 50% reduction in disproportionality by 2005, which has continued to present day. Stand the record. I would cite to ER 189 for the original 9.3 to 1 ratio. We cite to ER 130 for the 2005 ratio for African-Americans, which has dropped to 4.22. We do not have the 2007 figures in the record, although they're based, in part, on U.S. Census data, which of course, the Court can take judicial notice of. Would you ask us to? I'm sorry, Your Honor? The facts that you're giving us right now, are they properly in front of us? We believe they are, Your Honor, based on the census data from the prisons and from U.S. Census, which are already in the record, yes. Would you ask us to take judicial notice of that? I would ask you to take judicial notice of the fact that there's been a more than 50 percent decline in disproportionality for African-Americans. There's no basis to do that. You would have to file a proper motion. The Sentencing Commission, which the Court would take judicial notice of, is the       I'm sorry, Your Honor, we didn't have the statistics in the first instance, Your Honor. Thank you, Co-Counsel. Let me ask you something else. We brought, we made the point that no evidence has been provided of racially polarized voting under Factor 2. No evidence of at-large elected districts. No evidence of denial of access. No evidence of any occurrences of overt or subtle racial appeals under Factor 6. We showed that Washington voters supported President Obama in 2008, elected America's first Chinese-American governor on the mainland, elected an African-American to be chief executive of the largest county in our state, elected an African-American to be the mayor of the largest city in our state. We also provide evidence regarding responsiveness. The fact that the 2009 amendments to our disenfranchisement law were adopted is evidence of this, of this responsiveness. What is your response to the issue that I raised earlier about, and that Judge Reimer also had questions about, the 2009 statutory form that is presently before us for analysis, assuming that there is a claim in existence. Is that the version of the law? And if so, what is your response to opposing counsel's argument that that amendment has only made things worse? Your Honor, we believe that the current version of the law as amended in 2009 is the version of the law before this Court for the purposes of this case, because the relief that's enjoined is the current law. So it must be the current law before the Court, which was amended in 2009. Secondly, I don't believe that opposing counsel said that the amendments have made things worse. I think what he said is that there are still a lot of people who are disenfranchised, who are not incarcerated, who are supervised. A majority of the states which disenfranchise felons, disenfranchise them while they're in prison and while they're on community supervision or parole, that is the most common practice in the United States today. And the reason for that is the policy decision that because they're still on community supervision, they can be pulled back into prison at any time if they violate the terms of their release. And therefore, the policy decision has been made not to allow them to re-register, only to have their voting registration invalidated because they've been pulled back. It would be very difficult to administer such a system since some of the individuals on supervision are in and out of jail while they're on supervision for minor or large violations of their supervised release. So the State of Washington legislature, in greatly reducing the number of felons affected by our disenfranchisement law with the 2009 amendments, did make the policy decision to keep supervised felons as well as incarcerated felons within the scope of our state law. But how does it apply to Federal felons? Federal felons are not covered by our law. If they are – if they move into our State, or when our State can begin with and they're on Federal parole, they can register to vote. They're not covered by the law. The language of the statute refers expressly to those individuals on supervision who are convicted in a State court of Washington. So similarly, Chief Judge Kuczynski, if a convicted felon moves into our State from another State and is still on parole from that other State, they're not covered by our law. They are not disenfranchised in Washington. So all the felons should move – the former felons should move to Washington? No, thank you, Judge McKeon. Counsel, you argue that the Voting Rights Act does not apply to the felon disenfranchisement laws, but I hear Mr. Haygood in his argument saying, well, you know, it really doesn't matter that so far as this case is concerned, and putting aside for a moment whether the evidence is substantial or not, there has been a showing of discrimination and that's enough. What's your response? Judge O'Scanlon, we don't believe that it is enough to suddenly bring our felon disenfranchisement law within the ambit of the Voting Rights Act because we don't believe Congress intended it to apply unless there's a showing of intentional discrimination, as in Hunter v. Underwood. So we can conceive of a scenario, and we actually discussed a hypothetical a few minutes ago, about where the Court would be asked to consider a felon disenfranchisement law evidently enacted for intentionally discriminatory purposes. In that case, one would not reach the VRA because one of the Court, as the Court did in Hunter v. Underwood, would address it under the Fourteenth and Fifteenth Amendments, and, of course, the Supreme Court in Hunter did not refer to the VRA. The problem with that argument is that we have that very case right now in front of us because the Court here did dismiss the Fourteenth and Fifteenth Amendment claims and were left with the Voting Rights Act claims. So the case you're saying can't possibly occur is the one you're arguing. No, Your Honor. With all respect, what I said is the case involving intentional discrimination is not the case before us. As you said, that's been ruled out. And the evidence before us here is merely evidence of statistical disparities. What happens if we disagree with counsel on both sides and read that sentence that I referred to on page 10 of the District Court's order as a finding of intentional discrimination in the administration of the criminal justice system? Leaving in place the assumption we made that there was no discrimination in the passage of the felon disenfranchisement law. So no intention to discriminate there, but intentional discrimination in administration of the criminal justice system. Your Honor, in that scenario, then we would ask the Court to look at the other factors and conduct a complete totality of the circumstances analysis, which the Farrakhan II panel declined to do. And we believe you would reach the same conclusion as the other. But you asked us the same thing when I asked you about disparity. And you said disparity, you still have to look at the other factors. Disparity is not proof of intentionality. The hypothetical you just addressed to me was the hypothetical in which you said, well, what if we concluded that there was no intentionality? No, no, I understand. You said we should read the sentence as merely showing disparity, and then you go and you balance the other factors. So now I said to you, well, what if we read this as intentional? And you gave me the same answer. You said we go and balance the other factors as well. Chief Judge Kaczynski, what I hoped I said and I thought I said was that if it's mere statistical disparity, then we're not even proving Factor V here. The courts have been very clear that have looked at Voting Rights Act cases that if it's a mere statistical disparity, you don't prove even that one factor. I see. I may have misunderstood the question, but I think this is ships passing in the night here. I think if I understood the thrust of the Chief Judge's question, it's suppose the felon disenfranchisement statute was passed with no intention of discriminating and at the time in the 1860s when the first version was passed, no effect of discriminating. But the criminal justice system now was discriminating so that the effect of the combination of the two was, as a practical matter, to have a disproportionate exclusionary effect on the rights of some to participate in the political process. I think that this is really a question of if it's a mere statistical disparity,  You don't have to. Do we need a factual inquiry? Is this merely a legal inquiry? Why? I think there would have to be proof provided by the appellants that the results test that felon disenfranchise is being operated on account of race to deny the vote  I don't think they sought a --. But then you run into this problem of the 1982 change in section 1973 to the language which results in. Yes, Your Honor. The 1982 amendments are clearly aimed at the bold and plurality opinion of the U.S. Supreme Court, and they say intentionality is no longer the test. Rather, results are the test. But courts who have looked at that very language have said, wait a minute, you don't satisfy the results just by showing us statistical disparities. The courts have expressedly ruled that out as a --. But the hypothetical case that you're asked about is an attempt to discriminate in criminal law enforcement. Some bad sheriff or whoever is in charge of law enforcement tells all the deputies that work for him, ignore all those white suburbs. They're all well-behaved, nice folks. Just enforce the law in the black areas. Except there's no evidence of that occurring, Judge Kleinfeld. Let's suppose hypothetically. There was. Then, Judge Kleinfeld, one would still need to look and see the totality of circumstances. Even looking at that. How would you read it? Well, first of all, I would look at the language of Factor V itself, because analyzing discrimination in the criminal justice system picks up a slice of the social and historical circumstances and sort of the broad environment that Factor V refers to, but doesn't necessarily even rise to a sufficient level for Factor V itself. Secondly, one would look at the amount of evidence. Even in this case where they have statistical disparities and no intentionality shown, they explain away, you know, 80 percent of the disparities with legally relevant factors. We don't believe that. But that really goes to the posture of this case if we were to take it as it came to us districtly, which was a grant of summary judgment for the defendant, the State, and the denial of the plaintiff. So in the context of that, the district court uses two different words. It says the evidence sufficient. I can't tell if that's because you're looking at it under a summary judgment fashion. And then the court below also goes on to state that it's compelling. So how do you reconcile language in light of the procedural posture in which the case comes up to us? I believe that for purposes of summary judgment, you know, the judge construed the evidence in the light most favorable to the plaintiffs and concluded that Factor V is the test is met for purposes of bringing felon's enfranchisement in Washington within the scope of the VRA, but then went on to analyze all of the other factors which are relevant under the factors test and looking at how the circumstances concluded that, no, even though he finds some compelling evidence in this one part of the Washington State system, he doesn't find it anywhere else in the system. One of the questions I have is how an hearing can find anything from the experts' reports when each side is presenting them to say different things in terms of the magnitude of disparities, the geographic coverage of disparities, the crime coverage, and all the other things. You listed a variety of ways in which you believe the State refuted those. Is that something at that juncture that should have been decided on summary judgment? But is this really a summary judgment case in this context? We think that it is, Your Honor, in the sense that even looking at their evidence in the most favorable light, given the absence of any proof of intentionality and given the fact that even the statistical disparities are largely explained by legally relevant factors according to their own experts, that they simply don't prove Factor V. But even if, assuming for the sake of argument, Factor V is proved, you have to look at the other factors as well, which the district court did, and concluded in that sentence that, you know, the remarkable absence of any history of official discrimination the district court did not seem to have a difficult time concluding that our felon I think in summary, Your Honor, I think the district court judge is willing to give them the benefit of the doubt on Factor V. But he said, look, even if we give them Factor V, we have compelling evidence, the rest of the factors overwhelm Factor V in concluding that Washington's law doesn't come within the Voting Rights Act or doesn't violate the Voting Rights Act. When a case comes up to us on summary judgment, but the substantive law contemplates totality of the circumstances, balancing the factors analysis, what is our standard of review? I believe it's de novo, Judge Reimer, but of course, we argue in the first instance that the VRA doesn't apply. So the court does not have to reach that part of the case in order to conclude that the State law is not within the ambit of the VRA. You're saying we rebalance de novo. I think that the court does not need to reach it because the VRA does not apply to our State law, clearly, under the plain language, under the legislative, under the congruence and proportionality, our standard of the Supreme Court, the clear statement rule, all of it. And none of the other circuit courts, of course, have reached it either. Thank you. Mr. Hagel, you have three minutes. Your Honor, the record in this case, which is uncontested, reflects compelling evidence of racial discrimination in the criminal justice system. Disparity, not discrimination. Discrimination, Your Honor, on account of race. Intentional discrimination? Unintentional discrimination. Unintentional discrimination. Say it again, Your Honor. You said unintentional? Discrimination on account of race that we – our argument is that the impact of Washington's felon disenfranchisement law results in discrimination. Impact. Impact. Discrimination on account of race. Disparity, not discrimination. Your Honor, it's more than disparity. What the disparities here reflect, as the district court explained, is racial discrimination, that these disparities arise from and result in discrimination on account of race. And it's noteworthy to point out – I'm not sure you're mincing words. Either there is an intent to discriminate. This is a – I had this conversation with you earlier and with opposing counsel. So either the system in Washington, the criminal justice system, intentionally discriminates based on race, or the other possibility is that there is disparities with no intent. Congress expressly – One of the other – Congress expressly amended the Voting Rights Act in 1982. I'm not asking you about Congress. I'm asking you which you think – That Section 2 doesn't require an intent test, Your Honor. And what the evidence shows here – And there's no intent, then. Doesn't require intent. It's showing – I'm asking you what the situation is here. Say it again, Your Honor. What do you think the situation is here? Is there disparity or discrimination – intentional discrimination? There's racial discrimination, Your Honor. Counsel – And what the plaintiffs have shown here, as the district court recognized, is compelling evidence of racial discrimination. Counsel, let's suppose that that's true. And let's suppose that when we read Section 1973 of Title 42, we read A and B, both of them, we look at totality of the circumstances. What I'm wondering is whether history is one of the circumstances within the totality. As I understand it, all of the states, since the beginning of their existence, have excluded felons from voting. And, in fact, I believe that until recently, all democracies have, starting with Athens. Is that among the circumstances that can be considered in the totality of circumstances? History is one of the considerations, Your Honor. But, again, the challenge here is not to the general validity of felon disfranchisement law, whether historically or in the present. The challenge is the way in which race plays an impermissible role in the application of Washington's felon disfranchisement law. And it's important to recognize that notwithstanding the substantial record assembled here, the defendants have never contested any aspect of the plaintiff's evidence, notwithstanding opposing counsel's pronouncements to date. None of the facts raised by the state are in the record. What do you make of their argument that without intentional discrimination in the criminal justice system, you don't get Factor V at all? That's not supported by the text of Section 2. Section 2 is a results test. And what the plaintiffs have shown here, for example, in the context of prosecution, prosecutors essentially recommend a period of disfranchisement that's 50 percent longer for blacks than for similarly situated whites. That result, if Washington's law stood on its face, it would violate Section 2. In which sense are they similarly situated? Say it again, Your Honor? In what sense are they similarly situated? This is controlling for all past criminal convictions where there have been aggravating factors, if appropriate. These are similarly situated blacks and whites who are treated very differently by Washington's criminal justice system. And in particular in the context of prosecution, prosecutors recommend that similarly situated blacks spend 50 percent more time incarcerated than similarly situated whites. In the context of voting, this means that prosecutors recommend a period of disfranchisement that's 50 percent longer for blacks than for similarly situated whites. And that violates Section 2's results test, Your Honor. Can you give us a record size for that? Sure, Your Honor. That's record 213214. We are 213214. And that's just one aspect of plaintiffs' unpracticed evidence here, which the district court credited as compelling evidence of racial discrimination in the criminal justice system that injects inequality into the political process, such that in Washington State, an astonishing 24 percent of African American men and 15 percent of the entire black population are disfranchised. The arguments made by opposing counsels, they aren't in the record. What this has for it is a closed record reflecting compelling evidence of racial discrimination impacting voting. The only question in this case is whether this compelling evidence entitles plaintiffs to summary judgment as a matter of law. And as the Supreme Court explained in Beard v. Banks, the defendant's failure to contest any aspect of our evidence assumes its legitimacy, assumes its veracity. Thank you. Thank you, Your Honor. The case is now submitted. We are adjourned.
judges: Hearing Panel: Reinhardt, Tashima, McKeown en Banc Panel: Kozinski, Schroeder, O'scannlain, Rymer, Kleinfeld, Thomas, Graber, McKeown, Wardlaw, Gould, Paez, Rawlinson, Clifton